**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **JEFFREY C.  JENSEN,** | |
| **Plaintiff,** | |
| **v.** | **Case No.** |
| **SYNGENTA CROP PROTECTION, LLC, SYNGENTA AG, and CHEVRON U.S.A., INC.,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

**COMPLAINT FOR DAMAGES**

# TABLE OF CONTENTS

I.    SUMMARY OF THE CASE ................................................................................ 1

II.    PARTIES ........................................................................................................... 3

III.    JURISDICTION AND VENUE ......................................................................... 5

IV.    ALLEGATIONS COMMON TO ALL CAUSES OF ACTION ......................... 5

    A.    Defendants and their predecessors ........................................................ 5

        1.    Syngenta Crop Protection LLC and Syngenta AG ...................... 6

        2.    Chevron U.S.A., Inc. .................................................................. 7

    B.    Defendants' Sales of Paraquat in the United States ................................ 7

    C.    Common Uses for Defendants' Paraquat Products ................................. 9

    D.    Defendants Knew Prolonged Exposure to Paraquat was Foreseeable ...... 10

    E.    Background on Parkinson's disease ..................................................... 14

    F.    Background on the Toxicity of Paraquat ............................................. 16

    G.    Scientific Link Between Paraquat and Parkinson's disease ................... 17

    H.    Regulation of Paraquat ...................................................................... 18

V.    CAUSES OF ACTION ................................................................................... 20

    COUNT 1 - STRICT PRODUCT LIABILITY - DESIGN DEFECT (AGAINST
    DEFENDANTS SCPLLC AND SAG) ............................................................ 20

    COUNT 2 – STRICT PRODUCT LIABILITY – FAILURE TO WARN(AGAINST
    DEFENDANTS SCPLLC AND SAG) ............................................................ 24

    COUNT 3 – NEGLIGENCE (AGAINST DEFENDANT SCPLLC AND SAG) ................. 27

    COUNT 4 - BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (AGAINST
    DEFENDANTS SCPLLC AND SAG) ............................................................ 31

    COUNT 5 - UNFAIR TRADE PRACTICES ACT AND UNFAIR TRADE PRACTICES
    AND CONSUMER PROTECTION LAW (AGAINST DEFENDANTS SCPLLC
    AND SAG) ................................................................................................. 32

    COUNT 6 – STRICT PRODUCT LIABILITY - DESIGN DEFECT (AGAINST
    DEFENDANT CHEVRON U.S.A., INC.) ....................................................... 40

    COUNT 7 – STRICT PRODUCT LIABILITY - FAILURE TO WARN (AGAINST
    DEFENDANT CHEVRON U.S.A., INC.) ....................................................... 44

    COUNT 8 – NEGLIGENCE (AGAINST DEFENDANT CHEVRON U.S.A., INC.) .......... 46

    COUNT 9 - BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (AGAINST
    DEFENDANT CHEVRON U.S.A., INC.) ....................................................... 50

    COUNT 10 - UNFAIR TRADE PRACTICES ACT AND UNFAIR TRADE PRACTICES
    AND CONSUMER PROTECTION LAW (AGAINST DEFENDANT CHEVRON
    U.S.A., INC.) ............................................................................................. 52

VI.    PLAINTIFF PRAYERS FOR RELIEF ........................................................... 59

VII.    DEMAND FOR JURY TRIAL ....................................................................... 60

Plaintiff Jeffrey C. Jensen (hereafter, "Plaintiff") brings this complaint for damages against Defendants Syngenta Crop Protection, LLC; Syngenta AG; and Chevron U.S.A., Inc., and alleges:

## I.   <u>SUMMARY OF THE CASE</u>

1.     The manufacturers and sellers of paraquat deliberately concealed the dangers of paraquat for at least four decades, hid evidence of its dangers from government safety agencies, and knowingly unleashed a product they knew caused Parkinson's Disease on the public.

2.     Paraquat is a synthetic chemical compound[1] that since the mid-1960s has been developed, registered, manufactured, distributed, sold for use, and used as an active ingredient in herbicide products ("paraquat products") developed, registered, formulated, distributed, and sold for use in the United States ("U.S."), including the State of Wisconsin .

3.     From approximately May 1964 through approximately June 1981, Imperial Chemical Industries Limited ("ICI Limited") and certain ICI Limited subsidiaries[2], and from approximately June 1981 through approximately September 1986, Imperial Chemical Industries PLC ("ICI PLC") and certain ICI PLC subsidiaries, each of which was a predecessor[3] of Defendant SYNGENTA AG ("SAG") and/or Defendant SYNGENTA CROP PROTECTION LLC ("SCPLLC"), were engaged, directly, acting in concert with each other, and/or acting in concert with Chevron Chemical Company, previously known as California Chemical Company ("CHEVRON"), in the business of developing, registering, manufacturing, distributing, and

---

[1] Paraquat dichloride (EPA Pesticide Chemical Code 061601) or paraquat methosulfate (EPA Pesticide Chemical Code 061602).

[2] As used in this Complaint, "subsidiary" means a corporation or other business entity's wholly- owned subsidiary that is or formerly was engaged in the U.S. paraquat business directly or acting in concert with others.

[3] As used in this Complaint, "predecessor" means a corporation or other business entity or subsidiary thereof, to which a Defendant is a successor by merger, continuation of business, or assumption of liabilities, that formerly was engaged in the U.S. paraquat business directly or acting in concert with others.

selling paraquat for use as an active ingredient in paraquat products, and developing, registering, formulating, and distributing paraquat products, for sale and use in the U.S., including Wisconsin ("the U.S. paraquat business").

4.     From approximately May 1964 through approximately September 1986, CHEVRON, a predecessor of Defendant CHEVRON U.S.A., INC. ("CUSA"), was engaged, directly and/or acting in concert with ICI[4], in all aspects of the U.S. paraquat business.

5.     Between approximately May 1964 and approximately September 1986, ICI manufactured and sold to CHEVRON paraquat ("ICI-CHEVRON paraquat") for use by CHEVRON, and others to which CHEVRON distributed it, as an active ingredient in paraquat products that CHEVRON and others formulated and distributed for sale and use in the U.S., including in the State of Wisconsin  ("ICI-CHEVRON paraquat products").

6.     From approximately September 1986 through the present, ICI PLC and certain ICI PLC subsidiaries (including predecessors of SCPLLC) initially, then other SAG predecessors and certain subsidiaries of each (including predecessors of SCPLLC),and most recently SAG and certain SAG subsidiaries (including SCPLLC), have been engaged, directly and/or acting in concert with each other, in all aspects of the U.S. paraquat business.

7.     From approximately September 1986 through the present, ICI PLC and certain ICI PLC subsidiaries (including predecessors of SCPLLC) initially, then other SAG predecessors and certain subsidiaries of each (including predecessors of SCPLLC),and most recently SAG and certain SAG subsidiaries (including SCPLLC), have manufactured paraquat ("ICI-SYNGENTA paraquat") for their own use, and for use by others to which they distributed it, as an active

---

[4] As used in this Complaint, "ICI" means ICI Limited and various ICI Limited subsidiaries through approximately June 1981 and ICI PLC and various ICI PLC subsidiaries thereafter.

ingredient in paraquat products that SCPLLC and its predecessors and others have distributed for sale and use in the U.S., including in the State of Wisconsin  ("ICI-SYNGENTA paraquat products").

8.     Upon information and belief, Plaintiff was exposed to both ICI-CHEVRON paraquat products and/or ICI-SYNGENTA paraquat products (collectively, "Defendants' paraquat products").

9.     Upon information and belief, Plaintiff used Defendants' paraquat products regularly and frequently over a period of many years.

10.    Today, Plaintiff suffers from Parkinson's disease caused by many years of regular, frequent, prolonged exposure to paraquat from Defendants' paraquat products.

11.    All allegations contained herein are based upon information and belief and to the best of Plaintiff' knowledge given the information currently in Plaintiff' possession. Plaintiff reserve the right to amend all allegations upon continued information becoming available by discovery or otherwise.

## II.    **PARTIES**

### A.   **Plaintiff**

12.    Plaintiff Jeffrey C. Jensen is a resident of Wisconsin and has been a resident his entire life.

13.    From 1963 until 1992 Plaintiff lived and worked on his family 160-acre corn farm located in Eagle Wisconsin.

14.    Plaintiff's father purchased and mixed the pesticides Plaintiff was responsible for pulling the tractor with the sprayer killing everything around it.

15.     It was through this employment that Plaintiff was routinely exposed to Paraquat in a prolonged fashion in Wisconsin.

16.     On or around 1996, Plaintiff was diagnosed with Parkinson's disease.

17.     As part of the treatment for his Parkinson's, Plaintiff underwent bilateral subthalamic nucleus deep brain stimulation ("DBS") surgery in December 200

18.     8   Plaintiff has advanced Parkinson disease complicated by lower extremity spasticity.

19.      After seeing a neurologist, Plaintiff was diagnosed with probable Parkinson's, and began treatment for Parkinson's.

20.     Defendants and those with whom they were acting in concert manufactured and distributed the paraquat that was used in formulating Defendants' paraquat products and to which Plaintiff was exposed and formulated and distributed Defendants' paraquat products that contained the paraquat to which Plaintiff was exposed, intending or expecting that these products would be sold and used in the State of Wisconsin.

21.     When Plaintiff was exposed to paraquat, Plaintiff neither knew nor could have expected that paraquat was neurotoxic or that exposure to it could cause any neurological injury or neurodegenerative disease.

22.      Plaintiff only recently, within three year of this Complaint being filed, learned that paraquat caused their respective injuries. Prior to this, Plaintiff did not have knowledge of any facts that would have put them on notice that Plaintiff's Parkinson's Disease was due to Defendants' product nor has there been widespread media coverage that put him on notice.

23.     Plaintiff did not know and were unable to learn of the connection between Defendants' product and their injuries due to the concealment of the information by Defendants.

**B.  Defendants**

24.     SYNGENTA CROP PROTECTION LLC is a Delaware limited liability company

with its principal place of business in Greensboro, North Carolina. SCPLLC's sole member is Syngenta Seeds, LLC. The sole member of Syngenta Seeds, LLC is Syngenta Corporation, which is a Delaware corporation with its principal place of business in Delaware. Therefore, SCPLLC is a citizen of Delaware.

25.     SYNGENTA AG is a foreign corporation with its principal place of business in Basel,Switzerland.

26.     CHEVRON U.S.A., INC. is a Pennsylvania corporation with its principal place of business in San Ramon, California.

## III.   **JURISDICTION AND VENUE**

27.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1332 because there is complete diversity of the plaintiff and the defendants and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

28.     Venue is proper in the United States District Court for the Eastern District of Wisconsin under 28 U.S.C. §1391 because Defendants conduct business in this District, are subject to jurisdiction in this District, have sold, marketed, and or distributed paraquat within this District at all times relevant to this suit, and because a substantial part of the acts or occurrences giving rise to this suit occurred within this District.

29.     Notwithstanding the previous paragraph, this Complaint is filed in the Southern District of Illinois pursuant to the Court's Order of June 10, 2021, allowing direct filing of actions. However, it is not intended as a waiver of any rights relating to Lexecon, venue, or choice of law. To the contrary, Plaintiff expressly reserve any Lexecon rights or rights relating to venue or choice of law.

## IV.   **ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

### A.   **Defendants and their predecessors**

### 1. Syngenta Crop Protection LLC and Syngenta AG

30.     SAG is the successor in interest to the crop-protection business of each of its predecessors, AstraZeneca PLC ("AstraZeneca"), Zeneca Group PLC ("Zeneca Group"), ICI PLC, ICI Limited, and Plant Protection Limited ("PP Limited") and their respective crop-protection subsidiaries (collectively, "SAG's predecessors"), in that:

   a.   SAG, and each of SAG's predecessors, was the result of a corporate name change by, de facto consolidation or merger of, or mere continuation of, its immediate predecessor(s); and/or

   b.   SAG has expressly or impliedly agreed to assume any liability on claims arising from the historical operation of the crop-protection business of each of SAG's predecessors

31.     SCPLLC is the successor in interest to the crop-protection business of each of its predecessors, Syngenta Crop Protection, Inc. ("SCPI"), Zeneca Ag Products, Inc. ("Zeneca Ag") Zeneca, Inc. ("Zeneca"), ICI Americas, Inc. ("ICIA"), ICI United States, Inc. ("ICI US"), and ICI America Inc. ("ICI America") (collectively, "SCPLLC's predecessors"), in that:

   a.   SCPLLC, and each of SCPLLC's predecessors, was the result of a corporate name change by, de facto consolidation or merger of, or mere continuation of, its immediate predecessor(s); and/or

   b.   SCPLLC has expressly or impliedly agreed to assume any liability on claims arising from the historical operation of the crop- protection business of each of SCPLLC's predecessors.

32.     At all relevant times, SCPLLC, SCPI, Zeneca Ag, Zeneca, ICIA, ICI US, and/or ICI America was a wholly-owned U.S. crop-protection subsidiary of SAG or a predecessor of SAG.

33.     At all relevant times, PP Limited was a wholly-owned U.K. crop- protection subsidiary of ICI Limited, an unincorporated division of ICI Limited, or an unincorporated division of ICI PLC.

6

34.     At all relevant times, SAG and its predecessors exercised a degree of control over their crop-protection subsidiaries so unusually high that these subsidiaries were their agents or alter egos.

**2. Chevron U.S.A., Inc.**

35.     CUSA is the successor in interest to CHEVRON's crop-protection business, in that it has expressly assumed any liability on claims arising from the historical operation of that business.

**B.   Defendants' Sales of Paraquat in the United States**

36.     ICI Limited discovered the herbicidal properties of paraquat in the mid-1950s; developed herbicide formulations containing paraquat as an active ingredient in the early 1960s; and produced the first commercial paraquat formulation, which it registered it in England and introduced in certain markets under the brand name GRAMOXONE®, in 1962.

37.     ICI Limited was awarded a U.S. patent on herbicide formulations containing paraquat as an active ingredient in 1962.

38.     In May 1964, ICI Limited, PP Limited, and CHEVRON entered into an agreement for the distribution of paraquat in the U.S. and the licensing of certain paraquat-related patents, trade secrets, and other intellectual property ("paraquat licensing and distribution agreement").

39.     As a result of the May 1964 paraquat licensing and distribution agreement, paraquat became commercially available for use in the U.S. in or about 1965.

40.     In April 1975, ICI Limited, ICI US, and CHEVRON entered into a new paraquat licensing and distribution agreement that superseded the May 1964 agreement.

41.     In November 1981, ICIA, CHEVRON, and ICI PLC entered into a new paraquat licensing and distribution agreement, effective January 1982, which superseded in part and

amended in part the April 1975 agreement.

42.     From approximately May 1964 through approximately September 1986, pursuant to these paraquat licensing and distribution agreements, ICI and CHEVRON acted in concert in all aspects of the U.S. paraquat business.

43.     In September 1986, ICI and CHEVRON entered into an agreement terminating their paraquat licensing and distribution agreement.

44.     Under the September 1986 termination agreement, ICI paid CHEVRON for the early termination of CHEVRON's rights under their paraquat licensing and distribution agreement.

45.     Although the September 1986 termination agreement gave ICI the right to buy, or exchange for ICI-labeled paraquat products, CHEVRON-labeled paraquat products that CHEVRON had already sold to its distributors, CHEVRON-labeled paraquat products continued to be sold for use in the U.S. after this agreement for some period of time unknown to Plaintiff.

46.     SAG, SAG's predecessors, and subsidiaries of SAG and its predecessors (collectively, "SYNGENTA"), have at all relevant times manufactured more paraquat used as an active ingredient in paraquat products formulated and distributed for sale and use in the U.S., including in Wisconsin , than all other paraquat manufacturers combined.

47.     From the mid-1960s through at least 1986, SYNGENTA (as ICI) was the only manufacturer of paraquat used as an active ingredient in paraquat products formulated and distributed for sale and use in the U.S., including in Wisconsin .

48.     From approximately September 1986 through the present, SYNGENTA has:

    a.   manufactured paraquat for use as an active ingredient in paraquat products formulated and distributed for sale and use in the U.S., including Wisconsin ;

    b.   distributed paraquat for use as an active ingredient in paraquat products

formulated and distributed for sale and use in the U.S., including Wisconsin ;

c.   formulated paraquat products distributed for sale and use in the U.S., including Wisconsin ; and

d.   distributed paraquat products for sale and use in the U.S., including Wisconsin.

**C.   Common Uses for Defendants' Paraquat Products**

49.   Defendants' paraquat products have been used in the U.S. to kill broadleaf weeds and grasses before the planting or emergence of more than 100 field, fruit, vegetable, and plantation crops, to control weeds in orchards, and to desiccate (dry) plants before harvest. At all relevant times, the use of Defendants' paraquat products for these purposes was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON.

50.   Defendants' paraquat products were commonly used multiple times per year on the same ground, particularly when used to control weeds in orchards and in farm fields where multiple crops are planted in the same growing season or year. At all relevant times, the use of Defendants' paraquat products in this manner was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON.

51.   Defendants' paraquat products were typically sold to end users in the form of liquid concentrates that were then diluted with water in the tank of a sprayer and applied by spraying the diluted product onto target weeds. At all relevant times, the use of Defendants' paraquat products in this manner was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON.

52.   Defendants' paraquat products were typically formulated with a surfactant or surfactants, and/or a surfactant, surfactant product, or "crop oil," which typically contains one or more surfactants, was commonly added by users of Defendants' products, to increase the ability

of paraquat to stay in contact with and penetrate the leaves of target plants and enter plant cells. At all relevant times, the use of Defendants' paraquat products as so formulated and/or with such substances added was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON.

53.    Knapsack sprayers, hand-held sprayers, aircraft (i.e., crop dusters), trucks with attached pressurized tanks, and tractor-drawn pressurized tanks, were commonly used to apply Defendants' paraquat products. At all relevant times, the use of such equipment for that purpose was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON.

**D.   Defendants Knew Prolonged Exposure to Paraquat was Foreseeable**

54.    When Defendants' paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON, persons who used them and others nearby were commonly exposed to paraquat while it was being mixed and loaded into the tanks of sprayers, including as a result of spills, splashes, and leaks. At all relevant times, it was reasonably foreseeable to, and known to or foreseen by, SYNGENTA and CHEVRON that such exposure commonly would and did occur and would and did create a substantial risk of harm to the persons exposed.

55.    When Defendants' paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON, persons who sprayed them, and others nearby while they were being sprayed or when they recently had been sprayed, commonly were exposed to paraquat, including as a result of spray drift (the movement of herbicide spray droplets from the target area to an area where herbicide application was not intended, typically by wind), contact with sprayed plants and being

10

exposed by paraquat that was absorbed into the soil and ground water and wells. At all relevant times, it was reasonably foreseeable to, and known to or foreseen by, SYNGENTA and CHEVRON, that such exposure commonly would and did occur and would and did create a substantial risk of harm to the persons exposed.

56.     When Defendants' paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON, persons who used them and other persons nearby commonly were exposed to paraquat, including as a result of spills, splashes, and leaks, while equipment used to spray it was being emptied or cleaned or clogged spray nozzles, lines, or valves were being cleared. At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON that such exposure commonly would and did occur and would and did create a substantial risk of harm to the persons exposed.

57.     At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON that when Defendants' paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON, and people were exposed to paraquat as a result, paraquat could and did enter the human body via absorption through or penetration of the skin, mucous membranes, and other epithelial tissues, including tissues of the mouth, nose and nasal passages, trachea, and conducting airways, particularly where cuts, abrasions, rashes, sores, or other tissue damage was present, and that paraquat that entered the human body in one or more of these ways would and did create a substantial risk of harm to people so exposed.

58.     At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON that when Defendants' paraquat products were used

in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON, and people were exposed to paraquat as a result, paraquat could and did enter the human body via respiration into the lungs, including the deep parts of the lungs where respiration (gas exchange) occurs, and that paraquat that entered the human body in this way would and did create a substantial risk of harm to people so exposed.

59.     At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON that when Defendants' paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON, and people were exposed to paraquat as a result, paraquat could and did enter the human body via ingestion into the digestive tract of small droplets swallowed after entering the mouth, nose, or conducting airways, and that paraquat that entered the human body in this way would and did create a substantial risk of harm to people so exposed.

60.     At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON that when Defendants' paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON, and people were exposed to paraquat as a result, paraquat that entered the human body via ingestion into the digestive tract could and did enter the enteric nervous system (the part of the nervous system that governs the function of the gastrointestinal tract), and that paraquat that entered the enteric nervous system would and did create a substantial risk of harm to people so exposed.

61.     At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON that when Defendants' paraquat products were used

in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON, and people were exposed to paraquat as a result, paraquat that entered the human body, whether via absorption, respiration, or ingestion, could and did enter the bloodstream, and that paraquat that entered the bloodstream would and did create a substantial risk of harm to people so exposed.

62. At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON that when Defendants' paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON, and people were exposed to paraquat as a result, paraquat that entered the bloodstream could and did enter the brain, whether through the blood-brain barrier or parts of the brain not protected by the blood-brain barrier, and that paraquat that entered the brain would and did create a substantial risk of harm to people so exposed.

63. At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON that when Defendants' paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON, and people were exposed to paraquat as a result, paraquat that entered the nose and nasal passages could and did enter the brain through the olfactory bulb (a part of the brain involved in the sense of smell), which is not protected by the blood-brain barrier, and that paraquat that entered the olfactory bulb would and did create a substantial risk of harm to people so exposed.

64. At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON that when Defendants' paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or

foreseen by, SYNGENTA and CHEVRON, and people were exposed to paraquat products that contained surfactants or had surfactants added to them, the surfactants would and did increase the toxicity of paraquat toxicity to humans by increasing its ability to stay in contact with or penetrate cells and cellular structures, including but not limited to the skin, mucous membranes, and other epithelial and endothelial tissues, including tissues of the mouth, nose and nasal passages, trachea, conducting airways, lungs, gastrointestinal tract, blood-brain barrier, and neurons, and that this would and did increase the already substantial risk of harm to people so exposed.

**E.   Background on Parkinson's disease**

65.   Parkinson's disease is a progressive neurodegenerative disorder of the brain that affects primarily the motor system, the part of the central nervous system that controls movement.

66.   The characteristic symptoms of Parkinson's disease are its "primary" motor symptoms: resting tremor (shaking movement when the muscles are relaxed), bradykinesia (slowness in voluntary movement and reflexes), rigidity (stiffness and resistance to passive movement), and postural instability (impaired balance).

67.   Parkinson's disease's primary motor symptoms often result in "secondary" motor symptoms such as freezing of gait; shrinking handwriting; mask-like expression; slurred, monotonous, quiet voice; stooped posture; muscle spasms; impaired coordination; difficulty swallowing; and excess saliva and drooling caused by reduced swallowing movements.

68.   Non-motor symptoms—such as loss of or altered sense of smell; constipation; low blood pressure on rising to stand; sleep disturbances; and depression—are present in most cases of Parkinson's disease, often for years before any of the primary motor symptoms appear.

69.   There is currently no cure for Parkinson's disease; no treatment will stop or reverse its progression, and the treatments most commonly prescribed for its motor symptoms

14

tend to become progressively less effective, and to cause unwelcome side effects, the longer they are used.

70.    The selective degeneration and death of dopaminergic neurons (dopamine-producing nerve cells) in a part of the brain called the substantia nigra pars compacta ("SNpc") is one of the primary pathophysiological hallmarks of Parkinson's disease.

71.    Dopamine is a neurotransmitter (a chemical messenger that transmits signals from one neuron to another neuron, muscle cell, or gland cell) that is critical to the brain's control of motor function (among other things).

72.    The death of dopaminergic neurons in the SNpc decreases the production of dopamine.

73.    Once dopaminergic neurons die, they are not replaced; when enough dopaminergic neurons have died, dopamine production falls below the level the brain requires for proper control of motor function, resulting in the motor symptoms of Parkinson's disease.

74.    The presence of Lewy bodies (insoluble aggregates of a protein called alpha-synuclein) in many of the remaining dopaminergic neurons in the SNpc is another of the primary pathophysiological hallmarks of Parkinson's disease.

75.    Dopaminergic neurons are particularly susceptible to oxidative stress, a disturbance in the normal balance between oxidants present in cells and cells' antioxidant defenses.

76.    Scientists who study Parkinson's disease generally agree that oxidative stress is a major factor in—if not the precipitating cause of—the degeneration and death of dopaminergic neurons in the SNpc and the accumulation of Lewy bodies in the remaining dopaminergic neurons that are the primary pathophysiological hallmarks of Parkinson's disease.

**F.    Background on the Toxicity of Paraquat**

77.    Paraquat is highly toxic to both plants and animals because it causes and contributes to cause the degeneration and death of living cells in both plants and animals.

78.    Paraquat causes and contributes to cause the degeneration and death of plant and animal cells both directly, through oxidation, and indirectly, through oxidative stress created or aggravated by the "redox cycling" of paraquat; these processes damage lipids, proteins, and nucleic acids, molecules that are essential components of the structures and functions of living cells, and interfere with cellular functions—in plant cells, with photosynthesis, and in animal cells, with cellular respiration—that are essential to cellular health.

79.    In both plant and animal cells, paraquat undergoes redox cycling that creates or aggravates oxidative stress because of the "redox properties" inherent in paraquat's chemical composition and structure: paraquat is both a strong oxidant and has a high propensity to undergo redox cycling, and to do so repeatedly, in the presence of a suitable reductant and molecular oxygen, both of which are present in all living cells.

80.    The redox cycling of paraquat in living cells creates a "reactive oxygen species" known as superoxide radical, an extremely reactive molecule that can and often does initiate a cascading series of chemical reactions that can and often do create other reactive oxygen species that damage lipids, proteins, and nucleic acids, molecules that are essential components of the structures and functions of living cells.

81.    Because the redox cycling of paraquat can repeat indefinitely in the conditions typically present in living cells, a single molecule of paraquat can trigger the production of countless molecules of destructive superoxide radical. After even a tiny amount of paraquat enters the human brain, paraquat molecules continue to undergo redox cycling and continue to cause

damage to human brain cells. This repeated cycling continues in the presence of oxygen and continues to cause the death of dopaminergic neurons, eventually resulting in the onset of Parkinson's disease. However, even after the onset of Parkinson's disease, the redox cycling continues to cause brain cell damage and death for as long as the victim lives.

82.     The oxidation and redox potentials of paraquat have been known to science since at least the 1930s, and in the exercise of ordinary care should have been known, and were known, to SYNGENTA and CHEVRON at all relevant times.

83.     That paraquat is highly toxic to all living cells—both plant cells and all types of animal cells—has been known to science since at least the mid-1960s, and in the exercise of ordinary care should have been known, and was known, to SYNGENTA and CHEVRON at all relevant times.

84.     The high toxicity of paraquat to living cells of all types creates a substantial risk of harm to persons exposed to paraquat, which SYNGENTA and CHEVRON should have known in the exercise of ordinary care, and did know, at all relevant times.

85.     The same oxidation and redox potentials that make paraquat highly toxic to plant cells and other types of animal cells make paraquat highly toxic to nerve cells, including dopaminergic neurons, and create a substantial risk of neurotoxic harm to persons exposed to paraquat. SYNGENTA and CHEVRON should have known this in the exercise of ordinary care, and did know this, at all relevant times.

**G.   Scientific Link Between Paraquat and Parkinson's disease**

86.     The scientific community overwhelmingly agrees that paraquat causes Parkinson's disease.

87.     Although Parkinson's disease is not known to occur naturally in any species other

17

than humans, Parkinson's disease research is often performed using "animal models," in which scientists artificially produce in laboratory animal conditions that show features characteristic of Parkinson's disease in humans.

88.     Paraquat is one of only a handful of toxins that scientists use to produce animal models of Parkinson's disease.

89.     In animal models of Parkinson's disease, hundreds of studies involving various routes of exposure have found that paraquat causes the degeneration and death of dopaminergic neurons in the SNpc, other pathophysiology consistent with that seen in human Parkinson's disease, and motor deficits and behavioral changes consistent with those commonly seen in human Parkinson's disease.

90.     Hundreds of in vitro studies (experiments in a test tube, culture dish, or other controlled experimental environment) have found that paraquat causes the degeneration and death of dopaminergic neurons.

91.     Many epidemiological studies (studies of the patterns and causes of disease in defined populations) have found an association between paraquat exposure and Parkinson's disease, including multiple studies finding a two- to five-fold or greater increase in the risk of Parkinson's disease in populations with occupational exposure to paraquat compared to populations without such exposure.

### H.   Regulation of Paraquat

92.     The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq*., which regulates the distribution, sale, and use of pesticides within the U.S., requires that pesticides be registered with the EPA prior to their distribution, sale, or use, except as described by FIFRA. 7 U.S.C. 136a(a).

93.     As part of the pesticide registration process, the EPA requires, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.

94.     As a general rule, FIFRA requires registrants—not the EPA—to perform health and safety testing of pesticides, and the EPA generally does not perform such testing.

95.     The EPA registers (or re-registers) a pesticide if it believes, based largely on studies and data submitted by the registrant, that:

    a.  its composition is such as to warrant the proposed claims for it, 7 U.S.C. §136a(c)(5)(A);

    b.  its labeling and other material required to be submitted comply with the requirements of FIFRA, 7 U.S.C. § 136a(c)(5)(B);

    c.  it will perform its intended function without unreasonable adverse effects on theenvironment, 7 U.S.C. § 136a(c)(5)(C); and

    d.  when used in accordance with widespread and commonly recognized practice itwill not generally cause unreasonable adverse effects on the environment, 7 U.S.C. § 136a(c)(5)(D).

96.     FIFRA defines "unreasonable adverse effects on the environment" as "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb).

97.     Under FIFRA, "As long as no cancellation proceedings are in effect registration of a pesticide shall be prima facie evidence that the pesticide, its labeling and packaging comply with the registration provisions of [FIFRA]." 7 U.S.C. § 136a(f)(2).

98.     However, FIFRA further provides that "In no event shall registration of an article be construed as a defense for the commission of any offense under [FIFRA]." 7 U.S.C. § 136a(f)(2).

99.     FIFRA further provides that "…it shall be unlawful for any person in any State to distribute or sell to any person… any pesticide which is… misbranded." 7 U.S.C. § 136j(a)(1)(E).

100.    A pesticide is misbranded under FIFRA if, among other things:

    a.  its labeling bears any statement, design, or graphic representation relative thereto or to its ingredients which is false or misleading in any particular, 7 U.S.C. § 136(q)(1)(A);

    b.  the labeling accompanying it does not contain directions for use which are necessary for effecting the purpose for which the product is intended and if complied with, together with any requirements imposed under section 136a(d) of this title, are adequate to protect health and the environment, 7 U.S.C. § 136(q)(1)(F); or

    c.  the label does not contain a warning or caution statement which may be necessaryand if complied with, together with any requirements imposed under section 136a(d) of this title, is adequate to protect health and the environment," 7 U.S.C. § 136(q)(1)(G).

101.    Plaintiff do not seek in this action to impose on Defendants any labeling or packaging requirement in addition to or different from those required under FIFRA; accordingly, any allegation in this complaint that a Defendant breached a duty to provide adequate directions for the use of paraquat or warnings about paraquat, breached a duty to provide adequate packaging for paraquat, or concealed, suppressed, or omitted to disclose any material fact about paraquat or engaged in any unfair or deceptive practice regarding paraquat, is intended and should be construed to be consistent with that alleged breach, concealment, suppression, or omission, or unfair or deceptive practice, having rendered the paraquat "misbranded" under FIFRA.

102.    Plaintiff bring claims and seek relief in this action only under state law. Plaintiff do not bring any claims or seek any relief in this action under FIFRA.

## V.    CAUSES OF ACTION

### COUNT 1 - STRICT PRODUCT LIABILITY - DESIGN DEFECT
### (AGAINST DEFENDANTS SCPLLC AND SAG)

103.    Plaintiff incorporates in this Count by reference paragraphs 1 through 102  of this

Complaint.

104.    At all relevant times, Defendants and those with whom they were acting in concert were engaged in the business of designing, manufacturing and selling paraquat within the U.S.

105.    At all relevant times, Defendants and those with whom they were acting in concert intended and expected that Defendants' paraquat products would be sold and used in the State of Wisconsin .

106.    Defendants and those with whom they were acting in concert developed, registered, manufactured, distributed, and sold paraquat for use in formulating Defendants' paraquat products, and developed, registered, formulated and distributed Defendants' paraquat products for sale and use in the U.S., including in Wisconsin .

107.    Upon information and belief, for many years, Plaintiff was exposed to Defendants' paraquat products in Wisconsin repeatedly and regularly for hours at a time, resulting in the repeated, regular, and prolonged exposure of Plaintiff to paraquat.

108.    Defendants, by and through their agents, servants, workers, contractors, designers, manufacturers, sellers, suppliers, and/or distributors, are strictly liable under § 402A of the Restatement (Second) of Torts because:

   a.   Defendants are engaged in the business of designing, manufacturing, assembling, distributing, selling and/or supplying their paraquat products;

   b.   Defendants' paraquat products which caused Plaintiff's damages was created, designed, marketed, and placed in the general stream of commerce by Defendants;

   c.   Defendants' paraquat products were expected to and did reach users without substantial change in the condition in which they were designed, manufactured, distributed and/or sold; and

   d.   Defendants' paraquat products were designed, manufactured, distributed and/or sold in the defective condition for the reasons set forth below.

21

109.    At all relevant times, Defendants' paraquat products were in a defective condition that made them unreasonably dangerous when used in a manner that was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, Defendants and those with whom they were acting in concert, in that:

a.  they were designed, manufactured, formulated, and packaged such that when so used, paraquat was likely to be inhaled, ingested, and absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fieldsor orchards where they had been sprayed or areas near where they had been sprayed; and

b.  when inhaled, ingested, or absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, paraquat was likely to cause or contribute to cause latent, permanent, and cumulative neurological damage, and repeated exposures were likely to cause or contribute to causeclinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure;

110.    Defendants, by and through their agents, servants, workers, contractors, designers, manufacturers, sellers, suppliers, and/or distributors, are strictly liable under § 402A of the Restatement (Second) of Torts, by:

a.  Designing, assembling, manufacturing, selling, supplying and/or distributing a product in a defective condition;

b.  Designing, assembling, manufacturing, selling, supplying and/or distributing a product which caused Parkinson's disease;

c.  Designing, assembling, manufacturing, selling, supplying and/or distributing a product that was known to be unfit for the purpose for which Defendants suppliedthe product;

d.  Designing, assembling, manufacturing, selling, supplying and/or distributing a product that was unreasonably dangerous to its intended and foreseeable users;

e.  Designing, assembling, manufacturing, selling, supplying and/or distributing a product that was not safe for all of its intended and represented purposes;

f.  Designing, assembling, manufacturing, selling, supplying and/or distributing a product which lacked all the necessary safety features to protect users of

Defendants' paraquat products, including Plaintiff;

g.  Despite having actual knowledge of the harm caused by Defendants' paraquat products, failing to adequately warn users that Defendants' paraquat products caused the harm complained of herein;

h.  Despite having actual knowledge of the harm caused by Defendants' paraquat products, failing to make all the necessary corrections to eliminate the risk of Parkinson's disease;

i.  Failing to recall the defective and dangerous paraquat products after the dangers and risks were known or discovered;

j.  Designing, assembling, manufacturing, selling, supplying and/or distributing a product for which the risks and hazards of far outweighed any utility or benefit of the product (i.e., in violation of the risk-utility test); and

k.  Designing, assembling, manufacturing, selling, supplying and/or distributing a product the risks of which were unknown or unknowable to the consumer (i.e., in violation of the consumer expectations test).

111.    At all relevant times, this defective condition in Defendants' paraquat products existed when they left the control of Defendants and those with whom they were acting in concert and were placed into the stream of commerce.

112.    At all relevant times, Defendants and those with whom they were acting in concert knew or foresaw that this defective condition of Defendants' paraquat products would create a substantial risk of harm to persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, but in conscious disregard for the safety of others, including Plaintiff, continued to place them into the stream of commerce.

113.    As a result of this defective condition, Defendants' paraquat products either failed to perform in the manner reasonably to be expected in light of their nature and intended function, or the magnitude of the dangers outweighed their utility.

114.    At all relevant times, Defendants' paraquat products were used in a manner that

was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, Defendants and those with whom they were acting in concert.

115.    At all relevant times, Defendants concealed the defective condition of their product from Plaintiff thus preventing Plaintiff from discovering the causal link between their injury and paraquat.

116.    As a direct and proximate result of the defective and unreasonably dangerous condition of Defendants' paraquat products, Plaintiff developed Parkinson's disease; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of his life.

## **COUNT 2 – STRICT PRODUCT LIABILITY – FAILURE TO WARN**
### **(AGAINST  DEFENDANTS SCPLLC AND SAG)**

117.    Plaintiff incorporates in this Count by reference paragraphs 1 through 102 of this Complaint.

118.    At all relevant times, Defendants and those with whom they were acting in concert were engaged in the U.S. paraquat business.

119.    At all relevant times, Defendants and those with whom they were acting in concert intended and expected that Defendants' paraquat products would be sold and used in the State of Wisconsin.

120.    Defendants and those with whom they were acting in concert developed, registered, manufactured, distributed, and sold paraquat for use in formulating Defendants'

paraquat products, and developed, registered, formulated and distributed the Defendants' paraquat products for sale and use in the U.S., including Wisconsin.

121.    For many years, Plaintiff was exposed to Defendants' paraquat products in Wisconsin repeatedly and regularly for hours at a time, resulting in the repeated, regular, and prolonged exposure of Plaintiff to paraquat.

122.    At all relevant times, Defendants and those with whom they were acting in concert should have known in the exercise of ordinary care, and did know, that when used in a manner that was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, Defendants and those with whom they were acting in concert:

    a.  Defendants' paraquat products were designed, manufactured, formulated, and packaged such that when so used, paraquat was likely to be inhaled, ingested, and absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed; and

    b.  when inhaled, ingested, or absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, paraquat was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure.

123.    At all relevant times, Defendants' paraquat products were in a defective condition that made them unreasonably dangerous when used in a manner that was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, Defendants and those with whom they were acting in concert, in that:

    a.  they were not accompanied by directions for use that would have made paraquat unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed; and

25

     b.  they were not accompanied by a warning that when inhaled, ingested, or absorbedinto the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, paraquat was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and that repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure.

124.    At all relevant times, this defective condition in Defendants' paraquat products existed when they left the control of Defendants and those with whom they were acting in concert and were placed into the stream of commerce.

125.    At all relevant times, Defendants and those with whom they were acting in concert knew this defective condition of Defendants' paraquat products created a substantial risk of harm to persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, but in conscious disregard for the safety of others, including Plaintiff, continued to place them into the stream of commerce.

126.    As a result of this defective condition, Defendants' paraquat products either failed to perform in the manner reasonably to be expected in light of their nature and intended function, or the magnitude of the dangers outweighed their utility.

127.    At all relevant times, Defendants' paraquat products were used in a manner that was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, Defendants and those with whom they were acting in concert.

128.    At all relevant times, Defendants concealed the defective condition of their product from Plaintiff thus preventing Plaintiff from discovering the causal link between their injury and paraquat.

26

129.    As a direct and proximate result of the lack of adequate directions for the use of and warnings about the dangers of Defendants' paraquat products, Plaintiff developed Parkinson's disease; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of his life.

## COUNT 3 - NEGLIGENCE
### (AGAINST DEFENDANTS SCPLLC AND SAG)

130.    Plaintiff incorporates in this Count by reference paragraphs 1 through 102 of this Complaint.

131.    At all relevant times, Defendants and those with whom they were acting in concert were engaged in the U.S. paraquat business.

132.    At all relevant times, Defendants and those with whom they were acting in concert intended and expected that Defendants' paraquat products would be sold and used in the State of Wisconsin.

133.    Defendants and those with whom they were acting in concert developed, registered, manufactured, distributed, and sold paraquat for use in formulating Defendants' paraquat products, and developed, registered, formulated and distributed Defendants' paraquat products for sale and use in the U.S., including in Wisconsin.

134.    Upon information and belief, for many years, Plaintiff used Defendants' paraquat products in Wisconsin repeatedly and regularly for hours at a time, resulting in the repeated,

regular, and prolonged exposure of Plaintiff to paraquat.

135.    At all relevant times, in designing, manufacturing, and distributing paraquat for use in formulating paraquat products and in designing, formulating, packaging, labeling, and distributing paraquat products, Defendants and those with whom they were acting in concert owed a duty to exercise ordinary care for the health and safety of persons, including Plaintiff, whom they were reasonably foreseeable could be exposed to paraquat in such products.

136.    When Defendants and those with whom they were acting in concert designed, manufactured, and distributed paraquat for use in formulating Defendants' paraquat products and designed, formulated, packaged, labeled, and distributed Defendants' paraquat products, they were reasonably foreseeable and in the exercise of ordinary care Defendant should have known, and Defendants did know, that when Defendants' paraquat products were used in a manner that was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, Defendants and those with whom they were acting in concert:

a.  they were designed, manufactured, formulated, and packaged such that paraquat was likely to be inhaled, ingested, and absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed; and

b.  when inhaled, ingested, or absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, paraquat was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure.

137.    In breach of their duty to Plaintiff, Defendants and those with whom they were acting in concert negligently, and in conscious disregard for the safety of others:

a.  failed to design, manufacture, formulate, and package Defendants' paraquat products to make paraquat unlikely to be inhaled, ingested, and absorbed into

28

the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed;

b.  designed and manufactured paraquat and designed and formulated Defendants' paraquat products such that when inhaled, ingested, or absorbed into the bodies ofpersons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, paraquat was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure;

c.  failed to perform adequate testing to determine the extent to which exposure to paraquat was likely to occur through inhalation, ingestion, and absorption into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered  fields or orchards where they had been sprayed or areas near where they had been sprayed;

d.  failed to perform adequate testing to determine the extent to which spray drift from Defendants' paraquat products was likely to occur, including  their propensity to drift, the distance they were likely to drift, and the extent to which paraquat spray droplets were likely to enter the bodies of persons spraying Defendants' paraquat products or nearby during or after spraying;

e.  failed to perform adequate testing to determine the extent to which paraquat, when inhaled, ingested, or absorbed into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure;

f.  failed to perform adequate testing to determine the extent to which  paraquat, when formulated or mixed with surfactants or other pesticides or used along with other pesticides, and inhaled, ingested, or absorbed into the bodies of persons whoused Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest longafter exposure;

g.  failed to direct that Defendants' paraquat products be used in a manner that wouldhave made it unlikely for paraquat to have been inhaled, ingested, and absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed; and

h.  failed to warn that when inhaled, ingested, or absorbed into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, paraquat was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerativedisease, including Parkinson's disease, to develop over time and manifest long after exposure.

138.    At all relevant times, Defendants' paraquat products were used in a manner that was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, Defendants and those with whom they were acting in concert.

139.    At all relevant times, Defendants concealed the dangers of their product as listed above from Plaintiff thus preventing Plaintiff from discovering the causal link between their injury and paraquat.

140.    As a direct and proximate result of the negligence of Defendants and those with whom they were acting in concert, Plaintiff developed Parkinson's disease; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of his life.

## COUNT 4 - BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (AGAINST  DEFENDANTS SCPLLC AND SAG)

141.    Plaintiff incorporates in this Count by reference paragraphs 1 through 102 of this Complaint.

142.    At all relevant times, Defendants and those with whom they were acting in concert were engaged in the U.S. paraquat business.

143.    At all relevant times, Defendants and those with whom they were acting in concert intended and expected that Defendants' paraquat products would be sold and used in the State of Wisconsin.

144.    Defendants  and  those  with  whom  they  were  acting  in  concert  developed, registered, manufactured, distributed, and sold paraquat for use in formulating Defendants' paraquat products, and developed, registered, formulated and distributed Defendants' paraquat products for sale and use in the U.S., including in the State of Wisconsin.

145.    Plaintiff used Defendants' paraquat products in Wisconsin repeatedly and regularly for hours at a time, resulting in the repeated, regular, and prolonged exposure of Plaintiff to paraquat.

146.    At the time of each sale of Defendants' paraquat products that resulted in Plaintiff's exposure to paraquat, Defendants and those with whom they were acting in concert impliedly warranted that Defendants' paraquat products were of merchantable quality, including that they were fit for the ordinary purposes for which such goods were used, pursuant to Wis. Stat. Ann. §402.314.

147.    Defendants  and  those  with  whom  they  were  acting  in  concert  breached  this warranty as to each sale of Defendants' paraquat products that resulted in Plaintiff's exposure to paraquat, in that Defendants' paraquat products were not of merchantable quality because they

were not fit for the ordinary purposes for which such goods were used, and in particular:

    a.  they were designed, manufactured, formulated, and packaged such that paraquat was likely to be inhaled, ingested, and absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed; and

    b.  when inhaled, ingested, or absorbed into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, paraquat was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure.

148.   As a direct and proximate result of the breaches of the implied warranty of merchantability by Defendants and those with whom they were acting in concert, Plaintiff developed Parkinson's disease; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of his life.

### COUNT 5 - UNFAIR TRADE PRACTICES ACT AND UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
#### (AGAINST DEFENDANTS SCPLLC AND SAG)

149.   Plaintiff incorporates in this Count by reference paragraphs 1 through 102 of this Complaint.

150.   At all relevant times, Defendants and those with whom they were acting in concert were engaged in the U.S. paraquat business.

151.    At all relevant times, Defendants and those with whom they were acting in concert intended and expected that Defendants' paraquat products would be sold and used in the State of Wisconsin.

152.    Defendants and those with whom they were acting in concert developed, registered, manufactured, distributed, and sold paraquat for use in formulating Defendants' paraquat products, and developed, registered, formulated and distributed Defendants' paraquat products for sale and use in the U.S., including Wisconsin.

153.    Plaintiff, a member of Plaintiff's family, or Plaintiff's employer purchased Defendants' paraquat products in Wisconsin  for the purpose of controlling weeds and not for resale, and for many years, Plaintiff was exposed to these products in Wisconsin  repeatedly and regularly for hours at a time, resulting in the repeated, regular, and prolonged exposure of Plaintiff to paraquat.

154.    At all relevant times, Plaintiff, Defendants, and others with whom Defendants acted in concert, were consumers within the meaning of the Wisconsin  Unfair Business Practices Law, Wis. Stat. §100.20.

155.    At all relevant times, Plaintiff was a consumer within the meaning of the Wisconsin  Unfair Business Practices Law, Wis. Stat. §100.20.

156.    The Wisconsin Unfair Business Practices Law, Wis. Stat. §100.20 defines the numerous unfair, unconscionable, or deceptive methods, acts, or practices engaged in by Defendants here.

157.    At all relevant times, Defendants and those with whom they were acting in concert had  both constructive and actual knowledge that when Defendants' paraquat products were used in a manner that was intended or directed by or reasonably foreseeable to, and was known to or

foreseen by, Defendants and those with whom they were acting in concert:

     a.    they were designed, manufactured, formulated, and packaged such that paraquat was likely to be inhaled, ingested, and absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed; and

     b.    when inhaled, ingested, or absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, paraquat was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure.

     158.    At all relevant times, Defendants and those with whom they were acting in concert had both constructive and actual knowledge that:

     a.    adequate testing had not been performed to determine the extent to which exposure to paraquat was likely to occur through inhalation, ingestion, and absorption into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where there had been sprayed;

     b.    adequate testing had not been performed to determine the extent to which spray drift was likely to occur when Defendants' paraquat products were used, including their propensity to drift, the distance they were likely to drift, and the extent to which paraquat spray droplets were likely to enter the bodies of persons spraying or others nearby during or after spraying;

     c.    adequate testing had not been performed to determine the extent to which paraquat, when inhaled, ingested, or absorbed into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, were likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure; and

     d.    adequate testing had not been performed to determine the extent to which paraquat, when formulated or mixed with surfactants or other pesticides or used along with other pesticides, and inhaled, ingested, or absorbed into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas

34

near where there had been sprayed, was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure.

159. From the first date on which Defendants and those with whom they were acting in concert placed Defendants' paraquat products into the stream of commerce for use in the State of Wisconsin through the last date on which Plaintiff was exposed to Defendants' paraquat products, Defendants and those with whom they were acting in concert engaged in unfair or deceptive acts or practices, in violation of the Wisconsin  Unfair Business Practices Law, Wis. Stat. §100.20, including but not limited to deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression, or omission of material facts, in designing, manufacturing, and distributing paraquat for use in formulating Defendants' paraquat products for distribution for sale and use in the State of Wisconsin  and in designing, formulating, and distributing Defendants' paraquat products for sale and use in the State of Wisconsin, in that they:

    a.    concealed, suppressed, or omitted to disclose that Defendants' paraquat products were designed, manufactured, formulated, and packaged such that paraquat was likely to be inhaled, ingested, and absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed;

    b.    concealed, suppressed, or omitted to disclose that when inhaled, ingested, or absorbed into the bodies of persons who used Defendants' paraquat products, were nearby while they were was being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, paraquat was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure

    c.    concealed, suppressed, or omitted to disclose that adequate testing had not been performed to determine the extent to which exposure to paraquat was likely to occur through inhalation, ingestion, and absorption into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed;

d.  concealed, suppressed, or omitted to disclose that adequate testing had not been performed to determine the extent to which spray drift was likely to occur when Defendants' paraquat products were used, including their propensity to drift, the distance they were likely to drift, and the extent to which paraquat spray droplets were likely to enter the bodies of persons spraying or others nearby during or after spraying;

e.  concealed, suppressed, or omitted to disclose that adequate testing had not been performed to determine the extent to which paraquat, when inhaled, ingested, or absorbed into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields orchards where they had been sprayed or areas near where they had been sprayed, was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure; and

f.  concealed, suppressed, or omitted to disclose that adequate testing had not been performed to determine the extent to which paraquat, when formulated or mixed with surfactants or other pesticides or used along with other pesticides, and inhaled, ingested, or absorbed into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure.

160.    These acts and practices of Defendants and those with whom they were acting in concert in designing, manufacturing, and distributing paraquat for use in formulating Defendants' paraquat products for distribution for sale and use in the State of  Wisconsin and in designing, formulating, and distributing Defendants' paraquat products for sale and use in the State of Wisconsin were unfair because they offended public policy, were immoral, unethical, oppressive, and unscrupulous, and caused substantial injury to consumers.

161.    These acts and practices of Defendants and those with whom they were acting in concert in designing, manufacturing, and distributing paraquat for use in formulating Defendants' paraquat products for distribution for sale and use in the State of Wisconsin and in designing, formulating, and distributing Defendants' paraquat products for sale and use in the

State of Wisconsin offended the clearly stated public policy of the State of Wisconsin.

162.    These acts and practices of Defendants and those with whom they were acting in concert in designing, manufacturing, and distributing paraquat for use in formulating Defendants' paraquat products for distribution for sale and use in the State of Wisconsin clearly stated public policy of the as expressed in the Wisconsin Unfair Business Practices Law, Wis. Stat. §100.20.

163.    These acts and practices of Defendants and those with whom they were acting in concert in designing, manufacturing, and distributing paraquat for use in formulating Defendants' paraquat products for distribution for sale and use in the State of Wisconsin and in designing, formulating, and distributing Defendants' paraquat products for sale and use in the State of Wisconsin were immoral and unethical, as they served only to benefit Defendants and those with whom they were acting in concert at the expense of the heath of purchasers and users of Defendants' paraquat products and the public.

164.    These acts and practices of Defendants and those with whom they were acting in concert in designing, manufacturing, and distributing paraquat for use in formulating Defendants' paraquat products for distribution for sale and use in the State of Wisconsin and in designing, formulating, and distributing Defendants' paraquat products for sale and use in the State of Wisconsin were likely to cause substantial injury to purchasers and users of paraquat and the public by exposing them to unnecessary risks to their health.

165.    These acts and practices of Defendants and those with whom they were acting in concert in designing, manufacturing, and distributing paraquat for use in formulating Defendants' paraquat products for distribution for sale and use in the State of Wisconsin and in designing, formulating, and distributing Defendants' paraquat products for sale and use in the State of

Wisconsin were likely to cause, and did cause, substantial injury to purchasers and users of paraquat and the public in that but for these acts and practices, Defendants' paraquat products would not have been purchased for use in Wisconsin and persons who used them, were nearby while they was being used, or entered fields or orchards where they had been sprayed or areas near where it they been sprayed, would not have been injured by exposure to paraquat.

166.    Defendants and those with whom they were acting in concert in designing, manufacturing, and distributing paraquat for use in formulating Defendants' paraquat products for distribution for sale and use in the State of Wisconsin and in designing, formulating, and distributing Defendants' paraquat products for sale and use in the State of Wisconsin committed these acts and engaged in these practices in conscious disregard of the safety of others, including Plaintiff.

167.    The injuries caused by these acts and practices of Defendants and those with whom they were acting in concert in designing, manufacturing, and distributing paraquat for use in formulating Defendants' paraquat products for distribution for sale and use in the State of Wisconsin and in designing, formulating, and distributing Defendants' paraquat products for sale and use in the State of  Wisconsin  -- namely, purchasers' monetary losses and the injuries and damages (including monetary losses) to persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, including Plaintiff—are not outweighed by any countervailing benefit to consumers or competition.

168.    The injuries caused by these acts and practices of Defendants and those with whom  they were acting in concert in designing, manufacturing, and distributing paraquat for use in formulating Defendants' paraquat products for distribution for sale and use in the State of

Wisconsin and in designing, formulating, and distributing Defendants' paraquat products for sale and use in the State of  Wisconsin -- namely, purchasers' monetary losses and the injuries and damages (including monetary losses) to persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, including Plaintiff—were not reasonably avoidable; because Defendants and those with whom they were acting in concert had and failed to disclose material non-public information, consumers had no reason to anticipate the impending harm and thus avoid their injuries.

169.    Defendants and those with whom they were acting in concert intended that purchasers of Defendants' paraquat products, including Plaintiff, purchase them in reliance on these unfair and deceptive acts and practices.

170.    The facts that Defendants and those with whom they were acting in concert concealed, suppressed, or omitted to disclose were material to the decisions to purchase Defendants' paraquat products, and would not have been purchased had these facts been disclosed.

171.    These unfair and deceptive acts and practices of Defendants and those with whom they were acting in concert occurred in connection with their conduct of trade and commerce in the State of Wisconsin.

172.    These unfair and deceptive acts and practices of Defendant and those with whom they were acting in concert violated the Wisconsin Unfair Business Practices Law, Wis. Stat. §100.20.

173.    Defendant and those with whom they were acting in concert committed these unfair and deceptive practices knowing they created a substantial risk of harm to Plaintiff and

others who purchased and used Defendants' paraquat products in Wisconsin.

174.    As a direct and proximate result of the violations of the Wisconsin Unfair Business Practices Law, Wis. Stat. §100.20, by Defendant and those with whom they were acting in concert, Plaintiff developed Parkinson's disease; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of his life.

## COUNT 6 – STRICT PRODUCT LIABILITY - DESIGN DEFECT
### (AGAINST DEFENDANT CHEVRON U.S.A., INC.)

175.    Plaintiff incorporates in this Count by reference paragraphs 1 through 102 of this Complaint.

176.    From the beginning of the relevant time until 1990, Defendant and those with whom it was acting in concert were engaged in the business of designing, manufacturing and selling paraquat within the U.S.

177.    From the beginning of the relevant time until 1990, Defendant and those with whom it was acting in concert intended and expected that Defendant's paraquat products would be sold and used in the State of Wisconsin.

178.    Defendant and those with whom it was acting in concert developed, registered, manufactured, distributed, and sold paraquat for use in formulating Defendant's paraquat products, and developed, registered, formulated and distributed Defendant's paraquat products for sale and use in the U.S., including Wisconsin.

179.    Upon information and belief, for many years until 1990, Plaintiff was exposed to

Defendant's paraquat products in Wisconsin repeatedly and regularly for hours at a time, resulting in the repeated, regular, and prolonged exposure of Plaintiff to paraquat.

180.    Defendant, by and through their agents, servants, workers, contractors, designers, manufacturers, sellers, suppliers, and/or distributors, are strictly liable under § 402A of the Restatement (Second) of Torts because:

   a.  Defendants are engaged in the business of designing, manufacturing, assembling, distributing, selling and/or supplying their paraquat products;

   b.  Defendant's paraquat products which caused Plaintiff's damages was created, designed, marketed, and placed in the general stream of commerce by Defendant;

   c.  Defendant's paraquat products were expected to and did reach users without substantial change in the condition in which it was designed, manufactured, distributed and/or sold; and

   d.  Defendant's paraquat products were designed, manufactured, distributed and/or sold in the defective condition for the reasons set forth below.

181.    At all relevant times, Defendant's paraquat products were in a defective condition that made them unreasonably dangerous when used in a manner that was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, Defendants and those with whom it was acting in concert, in that:

   a.  they were designed, manufactured, formulated, and packaged such that when so used, paraquat was likely to be inhaled, ingested, and absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fieldsor orchards where they had been sprayed or areas near where they had been sprayed; and

   b.  when inhaled, ingested, or absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, paraquat was likely to cause or contribute to cause latent, permanent, and cumulative neurological damage, and repeated exposures were likely to cause or contribute to causeclinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure;

182.     Defendants, by and through their agents, servants, workers, contractors, designers, manufacturers, sellers, suppliers, and/or distributors, are strictly liable under § 402A of the Restatement (Second) of Torts, by:

    a.   Designing, assembling, manufacturing, selling, supplying and/or distributing a product in a defective condition;

    b.   Designing, assembling, manufacturing, selling, supplying and/or distributing a product which caused Parkinson's disease;

    c.   Designing, assembling, manufacturing, selling, supplying and/or distributing a product that was known to be unfit for the purpose for which Defendants suppliedthe product;

    d.   Designing, assembling, manufacturing, selling, supplying and/or distributing a product that was unreasonably dangerous to its intended and foreseeable users;

    e.   Designing, assembling, manufacturing, selling, supplying and/or distributing a product that was not safe for all of its intended and represented purposes;

    f.   Designing, assembling, manufacturing, selling, supplying and/or distributing a product which lacked all the necessary safety features to protect users of Defendant's paraquat products, including Plaintiff;

    g.   Despite having actual knowledge of the harm caused by Defendant's paraquat products, failing to adequately warn users that Defendant's paraquat products caused the harm complained of herein;

    h.   Despite having actual knowledge of the harm caused by Defendant's paraquat products, failing to make all the necessary corrections to eliminate the risk of Parkinson's disease;

    i.   Failing to recall the defective and dangerous paraquat products after the dangers and risks were known or discovered;

    j.   Designing, assembling, manufacturing, selling, supplying and/or distributing a product for which the risks and hazards of far outweighed any utility or benefit of the product (i.e., in violation of the risk-utility test); and

    k.   Designing, assembling, manufacturing, selling, supplying and/or distributing a product the risks of which were unknown or unknowable to the consumer (i.e., in violation of the consumer expectations test).

183.     At all relevant times, this defective condition in Defendant's paraquat products

existed when they left the control of Defendant and those with whom it was acting in concert and were placed into the stream of commerce.

184.    At all relevant times, Defendant and those with whom it was acting in concert knew or foresaw that this defective condition of Defendant's paraquat products would create a substantial risk of harm to persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, but in conscious disregard for the safety of others, including Plaintiff, continued to place them into the stream of commerce.

185.    As a result of this defective condition, Defendant's paraquat products either failed to perform in the manner reasonably to be expected in light of their nature and intended function, or the magnitude of the dangers outweighed their utility.

186.    At all relevant times, Defendant's paraquat products were used in a manner that was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, Defendant and those with whom it was acting in concert.

187.    At all relevant times, Defendant concealed the defective condition of their product from Plaintiff thus preventing Plaintiff from discovering the causal link between their injury and paraquat.

188.    As a direct and proximate result of the defective and unreasonably dangerous condition of Defendant's paraquat products, Plaintiff developed Parkinson's disease; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical

treatment and will continue to do so for the remainder of his life.

## COUNT 7 – STRICT PRODUCT LIABILITY - FAILURE TO WARN
### (AGAINST DEFENDANT CHEVRON U.S.A., INC.)

189.    Plaintiff incorporates in this Count by reference 1 through 102 of this Complaint.

190.    From the beginning of the relevant time period until 1990, Defendant and those with whom it was acting in concert were engaged in the U.S. paraquat business.

191.    At all relevant times, Defendant and those with whom it was acting in concert intended and expected that Defendant's paraquat products would be sold and used in the State of Wisconsin.

192.    Defendant and those with whom it was acting in concert developed, registered, manufactured, distributed, and sold paraquat for use in formulating Defendant's paraquat products, and developed, registered, formulated and distributed the Defendant's paraquat products for sale and use in the U.S., including in Wisconsin.

193.    From the beginning of the relevant time period until 1990, Plaintiff was exposed to Defendant's paraquat products in Wisconsin repeatedly and regularly for hours at a time, resulting in the repeated, regular, and prolonged exposure of Plaintiff to paraquat.

194.    From the beginning of the relevant time period until 1990, Defendant and those with whom it was acting in concert should have known in the exercise of ordinary care, and did know, that when used in a manner that was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, Defendant and those with whom it was acting in concert:

    a.    Defendant's paraquat products were designed, manufactured, formulated, and
          packaged such that when so used, paraquat was likely to be inhaled, ingested,
          and absorbed into the bodies of persons who used them, were nearby while they
          were being used, or entered fields or orchards where they had been sprayed or
          areas near where they had been sprayed; and

44

      b.    when inhaled, ingested, or absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, paraquat was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and repeated exposures were likely to cause or contribute to causeclinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure.

195.    At all relevant times, Defendant's paraquat products were in a defective condition that made them unreasonably dangerous when used in a manner that was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, Defendant and those with whom it was acting in concert, in that:

      a.    they were not accompanied by directions for use that would have made paraquat unlikely to be inhaled, ingested, and absorbed into the bodies of persons who usedthem, were nearby while they were being used, or entered fields  or orchards where they had been sprayed or areas near where they had been sprayed; and

      b.    they were not accompanied by a warning that when inhaled, ingested, or absorbedinto the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, paraquat was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and that repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure.

196.    At all relevant times, this defective condition in Defendant's paraquat products existed when they left the control of Defendant and those with whom it was acting in concert and were placed into the stream of commerce.

197.    From the beginning of the relevant time period until 1990, Defendant and those with whom it was acting in concert knew this defective condition of Defendant's paraquat products created a substantial risk of harm to persons who used them, were nearby while they were being used, or entered fields or orchardswhere they had been sprayed or areas near where they had been sprayed, but in conscious disregard for the safety of others, including Plaintiff,

continued to place them into the stream of commerce.

198.    As a result of this defective condition, Defendant's paraquat products either failed to perform in the manner reasonably to be expected in light of their nature and intended function, or the magnitude of the dangers outweighed their utility.

199.    From the beginning of the relevant time period until 1990, Defendant's paraquat products were used in a manner that was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, Defendant and those with whom it was acting in concert.

200.    From the beginning of the relevant time period until 1990, Defendant concealed the defective condition of their product from Plaintiff thus preventing Plaintiff from discovering the causal link between their injury and paraquat.

201.    As a direct and proximate result of the lack of adequate directions for the use of and warnings about the dangers of Defendant's paraquat products, Plaintiff developed Parkinson's disease; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of his life.

### COUNT 8 – NEGLIGENCE
### (AGAINST DEFENDANT CHEVRON U.S.A., INC.)

202.    Plaintiff incorporates in this Count by reference paragraphs 1 through 102 of this Complaint.

203.    From the beginning of the relevant time period until 1990, Defendant and those with whom it was acting in concert were engaged in the U.S. paraquat business.

204.     From the beginning of the relevant time period until 1990, Defendant and those with whom it was acting in concert intended and expected that Defendant's paraquat products would be sold and used in the State of Wisconsin.

205.     Defendant and those with whom it was acting in concert developed, registered, manufactured, distributed, and sold paraquat for use in formulating Defendant's paraquat products, and developed, registered, formulated and distributed Defendant's paraquat products for sale and use in the U.S., including in Wisconsin.

206.     Upon information and belief, from the beginning of the relevant time period until 1990, Plaintiff was exposed to Defendant's paraquat products in Wisconsin repeatedly and regularly for hours at a time, resulting in the repeated, regular, and prolonged exposure of Plaintiff to paraquat.

207.     From the beginning of the relevant time period until 1990, in designing, manufacturing, and distributing paraquat for use in formulating paraquat products and in designing, formulating, packaging, labeling, and distributing paraquat products, Defendant and those with whom it was acting in concert owed a duty to exercise ordinary care for the health and safety of persons, including Plaintiff, whom it was reasonably foreseeable could be exposed to paraquat in such products.

208.     When Defendant and those with whom it was acting in concert designed, manufactured, and distributed paraquat for use in formulating Defendant's paraquat products and designed, formulated, packaged, labeled, and distributed Defendant's paraquat products, it was reasonably foreseeable and in the exercise of ordinary care Defendant should have known, and Defendants did know, that when Defendant's paraquat products were used in a manner that was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, Defendant

and those with whom it was acting in concert:

    a.    they were designed, manufactured, formulated, and packaged such that paraquat was likely to be inhaled, ingested, and absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed; and

    b.    when inhaled, ingested, or absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, paraquat was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure.

209.    In breach of their duty to Plaintiff, Defendant and those with whom it was acting in concert negligently, and in conscious disregard for the safety of others:

    a.    failed to design, manufacture, formulate, and package Defendant's paraquat products to make paraquat unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed;

    b.    designed and manufactured paraquat and designed and formulated Defendant's paraquat products such that when inhaled, ingested, or absorbed into the bodies of persons who used Defendant's paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, paraquat was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure;

    c.    failed to perform adequate testing to determine the extent to which exposure to paraquat was likely to occur through inhalation, ingestion, and absorption into the bodies of persons who used Defendant's paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed;

    d.    failed to perform adequate testing to determine the extent to which spray drift from Defendant's paraquat products was likely to occur, including their propensity to drift, the distance they were likely to drift, and the extent to which paraquat spray droplets were likely to enter the bodies of persons spraying

Defendant's paraquat products or nearby during or after spraying;

e.   failed to perform adequate testing to determine the extent to which paraquat, when inhaled, ingested, or absorbed into the bodies of persons who used Defendant's paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure;

f.   failed to perform adequate testing to determine the extent to which  paraquat, when formulated or mixed with surfactants or other pesticides or used along with other pesticides, and inhaled, ingested, or absorbed into the bodies of persons whoused Defendant's paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest longafter exposure;

g.   failed to direct that Defendant's paraquat products be used in a manner that wouldhave made it unlikely for paraquat to have been inhaled, ingested, and absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed; and

h.   failed to warn that when inhaled, ingested, or absorbed into the bodies of persons who used Defendant's paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, paraquat was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerativedisease, including Parkinson's disease, to develop over time and manifest long after exposure.

210.   From the beginning of the relevant time period until 1990, Defendant's paraquat

products were used in a manner that was intended or directed by or reasonably foreseeable to,

and was known to or foreseen by, Defendant and those with whom it was acting in concert.

211.   From the beginning of the relevant time period until 1990, Defendant concealed

the dangers of their product as listed above from Plaintiff thus preventing Plaintiff from discovering the causal link between their injury and paraquat.

212.    As a direct and proximate result of the negligence of Defendant and those with whom was acting in concert, Plaintiff developed Parkinson's disease; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of his life.

## <u>COUNT 9 - BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY</u><br>(AGAINST DEFENDANT CHEVRON U.S.A., INC.)

213.    Plaintiff incorporates in this Count by reference paragraphs 1 through 102 of this Complaint.

214.    From the beginning of the relevant time period until 1990, Defendant and those with whom it was acting in concert were engaged in the U.S. paraquat business.

215.    From the beginning of the relevant time period until 1990, Defendant and those with whom it was acting in concert intended and expected that Defendant's paraquat products would be sold and used in the State of Wisconsin.

216.    Defendant and those with whom it was acting in concert developed, registered, manufactured, distributed, and sold paraquat for use in formulating Defendant's paraquat products, and developed, registered, formulated and distributed Defendant's paraquat products for sale and use in the U.S., including Wisconsin.

217.    Plaintiff used Defendant's paraquat products in Wisconsin repeatedly and

50

regularlyfor hours at a time, resulting in the repeated, regular, and prolonged exposure of Plaintiff to paraquat.

218.   At the time of each sale of Defendant's paraquat products that resulted in Plaintiff's exposure to paraquat, Defendant and those with whom it was acting in concert impliedly warranted that Defendant's paraquat products were of merchantable quality, including that they were fit for the ordinary purposes for which such goods were used, pursuant to Wis. Stat. Ann. §402.314.

219.   Defendant and those with whom it was acting in concert breached this warranty asto each sale of Defendant's paraquat products that resulted in Plaintiff's exposure to paraquat, in that Defendant's paraquat products were not of merchantable quality because they were not fitfor the ordinary purposes for which such goods were used, and in particular:

a.   they were designed, manufactured, formulated, and packaged such that paraquat was likely to be inhaled, ingested, and absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed; and

b.   when inhaled, ingested, or absorbed into the bodies of persons who used Defendant's paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, paraquat was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure.

220.   As a direct and proximate result of the breaches of the implied warranty of merchantability by Defendant and those with whom it was acting in concert, Plaintiff developed Parkinson's disease; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal

life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of his life.

### COUNT 10 - UNFAIR TRADE PRACTICES ACT AND UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
### (AGAINST DEFENDANT CHEVRON U.S.A., INC. )

221.    Plaintiff incorporates in this Count by reference paragraphs 1 through 102 of this Complaint.

222.    At all relevant times, Defendants and those with whom they were acting in concert were engaged in the U.S. paraquat business.

223.    At all relevant times, Defendants and those with whom they were acting in concert intended and expected that Defendants' paraquat products would be sold and used in the State of Wisconsin.

224.    Defendants and those with whom they were acting in concert developed, registered, manufactured, distributed, and sold paraquat for use in formulating Defendants' paraquat products, and developed, registered, formulated and distributed Defendants' paraquat productsfor sale and use in the U.S., including Wisconsin.

225.    Plaintiff, a member of Plaintiff's family, or Plaintiff's employer purchased Defendants' paraquat products in Wisconsin for the purpose of controlling weeds and not for resale, and for many years, Plaintiff was exposed to these products in Wisconsin repeatedly and regularly forhours at a time, resulting in the repeated, regular, and prolonged exposure of Plaintiff to paraquat.

226.    At all relevant times, Plaintiff, Defendants, and others with whom Defendants

52

acted in concert, were consumers within the meaning of the Wisconsin Unfair Business Practices Law, Wis. Stat. §100.20.

227.   At all relevant times, Plaintiff was a consumer within the meaning of the Wisconsin Unfair Business Practices Law, Wis. Stat. §100.20.

228.   The Wisconsin Unfair Business Practices Law, Wis. Stat. §100.20 defines the numerous unfair, unconscionable, or deceptive methods, acts, or practices engaged in by Defendants here.

229.   At all relevant times, Defendants and those with whom they were acting in concert had both constructive and actual knowledge that when Defendants' paraquat products were used in a manner that was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, Defendants and those with whom they were acting in concert:

    a.   they were designed, manufactured, formulated, and packaged such that paraquat was likely to be inhaled, ingested, and absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed; and

    b.   when inhaled, ingested, or absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, paraquat was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure.

230.   At all relevant times, Defendants and those with whom they were acting in concert hadboth constructive and actual knowledge that:

    a.   adequate testing had not been performed to determine the extent to which exposure to paraquat was likely to occur through inhalation, ingestion, and absorption into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where there had been sprayed;

    b.   adequate testing had not been performed to determine the extent to which spray

drift was likely to occur when Defendants' paraquat products were used, including their propensity to drift, the distance they were likely to drift, and the extent to which paraquat spray droplets were likely to enter the bodies of persons spraying or others nearby during or after spraying;

c.  adequate testing had not been performed to determine the extent to which paraquat, when inhaled, ingested, or absorbed into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, were likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure; and

d.  adequate testing had not been performed to determine the extent to which paraquat, when formulated or mixed with surfactants or other pesticides or used along with other pesticides, and inhaled, ingested, or absorbed into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where there had been sprayed, was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure.

231.   From the first date on which Defendants and those with whom they were acting in concert placed Defendants' paraquat products into the stream of commerce for use in the State of Wisconsin through the last date on which Plaintiff was exposed to Defendants' paraquat products, Defendants and those with whom they were acting in concert engaged in unfair or deceptive acts or practices, in violation of the Wisconsin Unfair Business Practices Law, Wis. Stat. §100.20, including but not limited to deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression, or omission of material facts, in designing, manufacturing, and distributing paraquatfor use in formulating Defendants' paraquat products for distribution for sale and use in the State of Wisconsin and in designing, formulating, and distributing Defendants' paraquat products for sale and use in the State of Wisconsin, in that they:

a.  concealed, suppressed, or omitted to disclose that Defendants' paraquat products were designed, manufactured, formulated, and packaged such that paraquat was likely to be inhaled, ingested, and absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed;

b.  concealed, suppressed, or omitted to disclose that when inhaled, ingested, or absorbed into the bodies of persons who used Defendants' paraquat products, were nearby while they were was being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, paraquat was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure

c.  concealed, suppressed, or omitted to disclose that adequate testing had not been performed to determine the extent to which exposure to paraquat was likely to occur through inhalation, ingestion, and absorption into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed;

d.  concealed, suppressed, or omitted to disclose that adequate testing had not been performed to determine the extent to which spray drift was likely to occur when Defendants' paraquat products were used, including their propensity to drift, the distance they were likely to drift, and the extent to which paraquat spray droplets were likely to enter the bodies of persons spraying or others nearby during or after spraying;

e.  concealed, suppressed, or omitted to disclose that adequate testing had not been performed to determine the extent to which paraquat, when inhaled, ingested, or absorbed into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields orchards where they had been sprayed or areas near where they had been sprayed, was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure; and

f.  concealed, suppressed, or omitted to disclose that adequate testing had not been performed to determine the extent to which paraquat, when formulated or mixed with surfactants or other pesticides or used along with other pesticides, and inhaled, ingested, or absorbed into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure.

232.     These acts and practices of Defendants and those with whom they were acting in concert in designing, manufacturing, and distributing paraquat for use in  formulating Defendants' paraquat products for distribution for sale and use in the State of  Wisconsin and in designing, formulating, and distributing Defendants' paraquat products for sale and use in the State of Wisconsin were unfair because they offended public policy, were immoral, unethical, oppressive, and unscrupulous, and caused substantial injury to consumers.

233.     These acts and practices of Defendants and those with whom they were acting in concert in designing, manufacturing, and distributing paraquat for use in  formulating Defendants' paraquat products for distribution for sale and use in the State of Wisconsin and in designing, formulating, and distributing Defendants' paraquat products for sale and use in the State of Wisconsin offended the clearly stated public policy of the State of Wisconsin.

234.     These acts and practices of Defendants and those with whom they were acting in concert in designing, manufacturing, and distributing paraquat for use in  formulating Defendants' paraquat products for distribution for sale and use in the State of Wisconsin  clearly stated public policy of the as expressed in the Wisconsin Unfair Business Practices Law, Wis. Stat. §100.20.

235.     These acts and practices of Defendants and those with whom they were acting in concert in designing, manufacturing, and distributing paraquat for use in  formulating Defendants' paraquat products for distribution for sale and use in the State of Wisconsin and in designing, formulating, and distributing Defendants' paraquat products for sale and use in the State of  Wisconsin were immoral and unethical, as they served only to benefit Defendants and those with whom they were acting in concert at the expense of the heath of purchasers and users of Defendants' paraquat products and the public.

236.    These acts and practices of Defendants and those with whom they were acting in concert in designing, manufacturing, and distributing paraquat for use in  formulating Defendants' paraquat products for distribution for sale and use in the State of Wisconsin  and in designing, formulating, and distributing Defendants' paraquat products for sale and use in the Wisconsin were likely to cause substantial injury to purchasers and users of paraquat and the public by exposing them to unnecessary risks to their health.

237.    These acts and practices of Defendants and those with whom they were acting in concert in designing, manufacturing, and distributing paraquat for use in  formulating Defendants' paraquat products for distribution for sale and use in the State of Wisconsin and in designing, formulating, and distributing Defendants' paraquat products for sale and use in the State of Wisconsin were likely to cause, and did cause, substantial injury to purchasers and users of paraquat and the public in that but for these acts and practices, Defendants' paraquat products would not have been purchased for use in Wisconsin and persons who used them, were nearby while they was being used, or entered fields or orchards where they had been sprayed or areas near where it they been sprayed, would not have been injured by exposure to paraquat.

238.    Defendants and those with whom they were acting in concert in designing, manufacturing, and distributing paraquat for use in  formulating Defendants' paraquat products for distribution for sale and use in the State of Wisconsin and in designing, formulating, and distributing Defendants' paraquat products for sale and use in the State of Wisconsin committed these acts and engaged in these practices in conscious disregard of the safety of others, including Plaintiff.

239.    The injuries caused by these acts and practices of Defendants and those with whom they were acting in concert in designing, manufacturing, and distributing paraquat for use

in formulating Defendants' paraquat products for distribution for sale and use in the State of Wisconsin and in designing, formulating, and distributing Defendants' paraquat products for sale and use in the State of  Wisconsin -- namely, purchasers' monetary losses and the injuries and damages (including monetary losses) to persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, including Plaintiff—are not outweighed by any countervailing benefit to consumers or competition.

240.    The injuries caused by these acts and practices of Defendants and those with whom they were acting in concert in designing, manufacturing, and distributing paraquat for use in formulating Defendants' paraquat products for distribution for sale and use in the State of Wisconsin and in designing, formulating, and distributing Defendants' paraquat products for sale and use in the State of Wisconsin -- namely, purchasers' monetary losses and the injuries and damages (including monetary losses) to persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, including Plaintiff—were not reasonably avoidable; because Defendants and those with whom they were acting in concert had and failed to disclose material non-public information, consumers had no reason to anticipate the impending harm and thus avoid their injuries.

241.    Defendants and those with whom they were acting in concert intended that purchasers of Defendants' paraquat products, including Plaintiff, purchase them in reliance on these unfair and deceptive acts and practices.

242.    The facts that Defendants and those with whom they were acting in concert concealed, suppressed, or omitted to disclose were material to the decisions to purchase

Defendants' paraquat products, and would not have been purchased had these facts been disclosed.

243.    These unfair and deceptive acts and practices of Defendants and those with whom they were acting in concert occurred in connection with their conduct of trade and commerce in the State of Wisconsin.

244.    These unfair and deceptive acts and practices of Defendant and those with whom they were acting in concert violated the Wisconsin Unfair Business Practices Law, Wis. Stat. §100.20.

245.    Defendant and those with whom they were acting in concert committed these unfair and deceptive practices knowing they created a substantial risk of harm to Plaintiff and others who purchased and used Defendants' paraquat products in Wisconsin.

246.    As a direct and proximate result of the violations of the Wisconsin Unfair Business Practices Law, Wis. Stat. §100.20, by Defendant and those with whom they were acting in concert, Plaintiff developed Parkinson's disease; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of his life.

## VI.    PLAINTIFF' PRAYERS FOR RELIEF

247.    Plaintiff Jeffrey C. Jensen prays that this Court enter judgment in his favor and against Defendants SYNGENTA CROP PROTECTION LLC, SYNGENTA AG, and CHEVRON U.S.A., INC., jointly and severally for compensatory damages in an amount greater

than $75,000.00 plus costs of suit, severally as to each Defendant for punitive damages in an amount sufficient to punish it and encourage it and others from similar conduct, for reasonable attorney's fees, and for such further relief as is just and appropriate in the circumstances.

## VII.   <u>DEMAND FOR JURY TRIAL</u>

248.   Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demand a jury trial as to all issues triable by a jury.

DATED: March 25, 2024

Respectfully Submitted,

MEYER WILSON CO., LPA

/s/ Layne C. Hilton
Layne C. Hilton, LA. Bar No. 36990
*Pro-Hac Vice*
900 Camp Street
Suite 337
New Orleans, LA 70130
Tel. *(614) 255-2697*
Fax (614) 224-6066
lhilton@meyerwilson.com


Richard S. Clark, OH Bar. No. 90605
*Pro-Hac Vice*
Matthew Wilson, OH Bar No. 72925
*Pro-Hac Vice*
305 W. Nationwide Blvd.
Columbus, OH 43215
Tel. (614) 224-6000
Fax. (614) 224-6066
rclark@meyerwilson.com
mwilson@meyerwilson.com


ATTORNEYS FOR PLAINTIFF